AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| FILED |
| CLERK, U.S. DISTRICT COURT |
| 06/19/21 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: ___jm___ DEPUTY |

United States of America

v.

JOSE MANUEL BRISENO VILLANUEVA,

Defendant(s)

Case No.    2:21-mj-02945-Duty

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of June 17, 2021, in the county of Los Angeles in the Central District of California, the

defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1); (b)(1)(A) | Possession with Intent to Distribute Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Gustavo Rios Jr.*
*Complainant's signature*

Gustavo Rios Jr., Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    June 19, 2021

*Judge's signature*

City and state:    Los Angeles, California

Hon. Maria A. Audero, U.S. Magistrate Judge
*Printed name and title*

AUSA: Maria Elena Stiteler (x6148)

## AFFIDAVIT

I, Gustavo Rios, Jr., being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Juan Manuel BRISENO VILLANUEVA ("BRISENO"), for violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2.    This affidavit is also made in support of an application for a warrant to search the following digital devices in the custody of the Glendale Police Department in Glendale, California, (collectively, the "SUBJECT DEVICES") as described more fully in Attachment A:

a.    SUBJECT DEVICE 1: one Samsung Phone, Model A21, with IMEI 354232114987655, recovered during a traffic stop of BRISENO; and

b.    SUBJECT DEVICE 2: one LG Phone, Model Aristo 4+, with IMEI 358335101033999, recovered during a traffic stop of BRISENO.

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances); 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances); 18 U.S.C. § 922(g) (prohibited person in possession of a firearm); and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses"), as described more

fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.     I am a Special Agent ("SA") with Homeland Security Investigations, and have been so employed since March 2016.  I am currently assigned as a SA with the Los Angeles Interagency Metropolitan Police Apprehension Crime Task Force ("LA IMPACT"). Prior to my employment by the Department of Homeland Security, I was employed as a Border Patrol Agent with the United States Border Patrol, for approximately seven years.

6.     I have completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, which included training in the investigation of various crimes.  During my employment with HSI, I have conducted several criminal investigations relating to narcotics smuggling, including the unlawful importation, possession, and distribution

of controlled substances, as well as numerous interviews of defendants, witnesses, and victims.

7.    During the course of my employment as a law enforcement officer, I have received training regarding laws pertaining to arrest, search and seizure, and evidence collection.  I have also gained practical experience making arrests, conducting searches and seizures, and collecting evidence.  Between my employment by the Department of Homeland Security and the United States Border Patrol, I have received over one year of academy training, and over one year of formalized field training.

8.    Additionally, I have had hundreds of hours of formal and informal training in a wide variety of investigative and other law enforcement subjects, including mobile surveillance and narcotics sales and trafficking investigations.  I have received numerous hours of instruction from SAs and detectives at LA IMPACT regarding narcotics packaging, sales, transportation, and usage.  I have received training from court qualified experts in the fields of criminal investigations and narcotics-related investigations.

9.    During the course of my employment, I have received specialized training in the fields of criminal investigation by attending numerous courses in criminal law, criminal investigation, narcotics investigation and laws of arrest.  I have attended a one-day surveillance class, which included mobile and static surveillance.  The class also covered counter-surveillance tactics utilized by criminals.  I have conducted

covert surveillance on residences and subjects that are suspected of selling narcotics.

10.  I have assisted in serving search warrants for the Department of Homeland Security, the Federal Bureau of Investigation, the Drug Enforcement Administration, several local police departments, and LA IMPACT, in connection with investigations regarding narcotics, weapons, and various other offenses.  I have had specialized training and field experiences in violations dealing with heroin, cocaine, amphetamines, cannabis, depressants, prescription medication, and other dangerous drugs.

### III.  SUMMARY OF PROBABLE CAUSE

11.  On June 17, 2021, Customs and Border Protection ("CBP") officers saw a vehicle ("V-1") enter the United States from Mexico at the San Ysidro, California Port of Entry.  During the pre-primary inspection, a CBP canine handler both conducted an exterior and interior sniff of V-1 and received positive alerts, and also observed indications of an aftermarket non-factory floor compartment, which are consistent with narcotics and other contraband being smuggled from Mexico into the United States.  A CBP officer scanned V-1 with an x-ray machine that revealed anomalies consistent with narcotics concealed within hidden compartments.

12.  CBP officers and Homeland Security Investigations agents elected to release V-1 and the driver ("Individual-1") without further delay so V-1 could be followed to its intended destination without alerting Individual-1 or other co-

conspirators to the involvement of law enforcement.  HSI agents and other law enforcement agencies in the San Diego and Los Angeles area conducted surveillance on V-1, and ultimately watched the driver of V-1 arrive at an auto parts store in Los Angeles, California, and meet with a second person who was later identified as BRISENO.  HSI agents observed Individual-1 briefly speak to BRISENO, after which BRISENO entered V-1 and drove it to a nearby park.  A Los Angeles Police Department Special Flights Services ("LAPD SFS") tactical flight officer who was conducting aerial surveillance observed BRISENO transfer a package from V-1 and to a white 2009 Jeep utility vehicle, bearing California license plate 6FKJ525 ("V-2").

13.  After transferring the package, agents observed BRISENO take V-1 back to the parking lot of the auto parts store and return it to Individual-1.  BRISENO then walked to V-2, entered V-2, and drove away.

14.  As directed by Glendale Police Department officers, uniformed deputies with Los Angeles County Sheriff's Department initiated a traffic stop of BRISENO before he entered a nearby residence.  A subsequent search of V-2 revealed approximately 16 pounds (7.25 kilograms) of suspected methamphetamine, an estimated 30,000 to 60,000 pills (approximately 4.5 kilograms) believed to contain fentanyl, 16.5 pounds (7.5 kilograms) of bricks of a substance believed to contain fentanyl, a 9mm Smith & Wesson handgun, and a nearby magazine that was fully loaded with rounds of 9mm ammunition.  The 9mm Smith & Wesson handgun and the magazine were located within arms-reach of BRISENO while

he was driving V-2.  The two SUBJECT DEVICES were also seized from V-2, as discussed below.

15.  A subsequent consent search of a residence which BRISENO was returning to in V-2 revealed an additional approximately 30 pounds of suspected methamphetamine and approximately 25 pounds of suspected cocaine.

16.  BRISENO is a Mexican citizen and an undocumented resident of the United States.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

17.  Based on my review of law enforcement reports, my conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.  HSI INVESTIGATORS IDENTIFY A VEHICLE CONTAINING SUSPECTED NARCOTICS AT THE SAN YSIDRO PORT OF ENTRY**

18.  On June 17, 2021, at approximately 9:40 AM, CBP officers observed a vehicle ("V-1") enter the United States from Mexico at the San Ysidro, California Port of Entry.

19.  During pre-primary inspection, a CBP Canine Enforcement Officer screened the exterior and interior of V-1 with the officer's certified drug detection dog and received positive alerts.  Upon further inspection, a CBP officer observed new screws and non-factory metal consistent with hidden compartments near the passenger floor area of V-1.  Based on my training and experience, aftermarket non-factory compartments are added into vehicles in an effort to conceal contraband being smuggled from Mexico into the United States via the Port of Entry.

20.   During pre-primary inspection, a CBP officer also scanned V-1 with a Z-Portal x-ray machine.  The CBP officer observed anomalies within V-1 consistent with hidden compartments utilized by narcotic smugglers attempting to conceal their contraband when smuggling them into the United States from Mexico.

21.   To facilitate further investigation, CBP officers did not open or inspect the aftermarket compartment.  Instead, agents decided to try to follow V-1 to its intended destination using pursuit and aerial surveillance.[1]

22.   After V-1 left the Port of Entry, agents followed V-1 as it traveled north along Interstate 5 towards Los Angeles, California.

---

[1] Agents also covertly installed a GPS tracking device on V-1 while at the border.  Because of the exigencies of the situation and to avoid a longer delay that could have caused the driver or any co-conspirators to suspect or detect that the suspected narcotics had been discovered by law enforcement, agents installed the GPS tracking device and allowed V-1 to leave before applying for a warrant.  Agents did not immediately monitor the GPS tracking device.  Rather, after installation, an agent with the Drug Enforcement Administration ("DEA") applied for and received authorization from the Honorable Allison H. Goddard in the Southern District of California to use the pre-installed GPS tracking device on V-1.  In this warrant application, the DEA agent erroneously stated that the CBP Canine Enforcement Officer observed "packages concealed in the passenger floor area of V-1."  Instead, the CBP Canine Enforcement Officer observed an aftermarket compartment installed in the floorboard of V-1 that was consistent with drug trafficking.  The application accurately described the canine alert and X-ray results consistent with drug packaging.  Moreover, the results of the GPS tracking device were not necessary to follow the vehicle as agents followed V-1 to its destination using visual and aerial surveillance, separate and apart from the GPS tracking device.

**B.    AGENTS VISUALLY SURVEIL V-1 IN THE LOS ANGELES AREA**

23.    On June 17, 2021, at approximately 12:00 PM, I and other HSI agents assigned to LA IMPACT, Group 24; detectives from the Glendale Police Department ("GPD"); and aerial surveillance from Los Angeles Police Department Special Flights Services ("LAPD SFS"), took over lead surveillance of V-1 from agents assigned to HSI San Diego Narcotics Enforcement Team ("SDNET") along Interstate 5 in Orange County.

24.    From participating in this surveillance and reviewing LA IMPACT real-time communications related to the surveillance and enforcement operation, I recall the following series of events from the afternoon of June 17, 2021:

a.    Agents observed V-1 take the 22 West exit toward Long Beach, California.  Immediately after taking the exit, V-1 pulled off to the side of the road and parked for an extended period.  At approximately 12:40 PM, V-1 was observed re-entering 22 West heading towards Long Beach, California.

b.    In Long Beach, California, V-1 stopped at an office printing and shipment center located on E. Seventh, Street, Long Beach, California 90804.  After a short period, V-1 exited and continued to a gas station on Redondo Avenue, Long Beach, California 90804.  At approximately 1:00 PM, Individual-1, the driver of V-1, was observed speaking with an unknown female.

c.    For approximately the next two hours, Individual-1 drove V-1 on Interstate 405, Interstate 605, Interstate 710, Interstate 110, California State Route 22, California State

8

Route 91 and various surface streets in between.  While traveling, V-1 was observed exiting and re-entering the freeways, exiting and entering the opposite direction of travel as before, and parking for brief periods of time.

25.  Based on my training and experience, these are common tactics and techniques utilized by narcotics smugglers in order to detect and deter law enforcement surveillance.

**C.    BRISENO MEETS INDIVIDUAL-1 AT AN AUTOZONE AND TAKES V-1 TO HIS VEHICLE TO TRANSFER A PACKAGE TO HIS VEHICLE**

26.  HSI agent Arturo Becerra narrated the following information to me and other members of LA IMPACT during the surveillance of V-1:

a.    At approximately 3:50 PM, HSI agents observed Individual-1 drive V-1 to an AutoZone located on Whittier Boulevard, Los Angeles, California 90023.  Individual-1 was approached by a Hispanic male, later identified as Juan Manuel BRISENO VILLANUEVA (hereinafter referred to as "BRISENO"), wearing gray cargo shorts, white tank top, ball cap, sunglasses, black socks and sandals.  I have reviewed photographs of Individual-1 meeting BRISENO.

b.    Individual-1 and BRISENO spoke for a short time, then BRISENO drove away in V-1, while Individual-1 stayed at the AutoZone.

27.  Law enforcement officers followed BRISENO, who drove V-1 to Salazar Park, located approximately one block away, and parked V-1 next to a white 2009 Jeep Utility vehicle bearing California license plate 6FKJ525 (hereinafter referred to as V-

2).  A record check of V-2's license plate revealed a registered owner of D.M. at an address on Hubbard Street, Los Angeles, California 90022 ("the Hubbard residence").

28.  I understand the following from speaking with LAPD SFS tactical flight officer Nick Rothemic:

     a.  LAPD SFS officer Nick Rothemic observed BRISENO exit V-1 and take a black bag from V-2.  Officer Rothemic then observed BRISENO crouch outside first the driver's side and later the passenger side of V-1, each time bending down towards the floorboard of the vehicle.  BRISENO was then observed taking the black bag back to V-2 as if transferring items from V-1 to V-2.  Based on my training and experience, specifically with narcotics trafficking, I believe that BRISENO moved the suspected contraband from the hidden compartments within V-1 and into V-2.

29.  Law enforcement officers observed BRISENO get back into V-1 and return to the AutoZone where Individual-1 was waiting.  HSI agents observed Individual-1 and BRISENO speak for a short time before BRISENO departed the AutoZone on foot back to V-2.

**D.  LAW ENFORCEMENT OFFICERS STOPPED V-2 AND DISCOVERED SUSPECTED METHAMPHETAMINE, SUSPECTED FENTANYL, A FIREARM, AND AMMUNITION**

30.  As directed by Glendale Police Department officers, at approximately 4:40 PM, uniformed deputies with Los Angeles County Sheriff's Department conducted a vehicle stop on V-2, just outside the registered owner's residence on Hubbard Street, Los Angeles, California 90022.

31.   I understand the following from speaking with Deputies H. Saavedra and J. Sanchez of the Los Angeles County Sheriff's Department:

a.   The deputies stated that V-2 was pulled over for vehicle code violations including driving over the center line of the street.  During the vehicle stop, BRISENO stated he did not have a license to drive the vehicle.  The deputies placed BRISENO under arrest for operating a motor vehicle without a valid driver's license and a subsequent search incident to arrest of BRISENO revealed suspected methamphetamine in his left pocket.

b.   In a subsequent search of the vehicle after placing BRISENO under arrest, the deputies found approximately 16 pounds (7.25 kilograms) of suspected methamphetamine; an estimated 30,000 to 60,000 pills (approximately 4.5 kilograms) with an "M30" stamp; 16.5 pounds (7.5 kilograms) of bricks of suspected narcotics; a 9mm Smith & Wesson handgun; and a nearby magazine that was fully loaded with rounds of 9mm ammunition.  I understand the following based on my training and experience and from speaking to GPD Detective Ivan Cornejo, who conducted field tests on the suspected narcotics:

i.   A field test was conducted on the 16 pounds (7.25 kilograms) of suspected methamphetamine, and the results came back positive for methamphetamine.

ii.   Based on my training and experience, pills bearing an "M30" stamp that are smuggled into the United States from Mexico frequently contain fentanyl.

11

iii. Field tests of the bricks of the suspected narcotics tested preliminarily negative for cocaine and heroin; however, the bricks were similar in appearance and consistency with the pills of suspected fentanyl.

c.    Deputies Saavedra and Sanchez stated that when they stopped BRISENO, the firearm was located between the driver's seat and the center console and the loaded magazine was on the driver's seat, both of which were within BRISENO's immediate reach while he was transporting the suspected narcotics.

d.    Deputies Saavedra and Sanchez further stated that during the vehicle stop, a woman who was later identified as D.M., the registered owner of V-2 and believed to be BRISENO's wife, was in the driveway of the Hubbard residence holding the driveway gate open for V-2.

E.    **SEARCH OF THE HUBBARD RESIDENCE AND SEIZURE OF APPROXIMATELY 30 POUNDS OF METHAMPHETAMINE AND 25 POUNDS OF COCAINE**

32.   At approximately 4:59 PM, HSI SAs Andre Lamon and Gustavo Rios, Jr. read BRISENO's wife, D.M., her Miranda advisal.  D.M. stated she understood her rights and consented to speak with the agents.[2]  D.M. also provided consent to agents to search the Hubbard residence.

33.   A subsequent search of the Hubbard residence revealed approximately 30 pounds of a white crystalline substance consistent with the characteristics of methamphetamine and

---

[2] D.M. also stated during her conversation with the agents that she did not want to lose her kids.

approximately 25 pounds of suspected cocaine fashioned in multiple bricks.  As I understand from speaking to GPD Detective Ivan Cornejo, the suspected methamphetamine was field tested, with the results coming back positive for methamphetamine, and the suspected cocaine was field tested, with the results coming back positive for cocaine.

  **F.** **POST MIRANDA INTERVIEW OF BRISENO**

  34. On June 17, 2021, at approximately 9:49 PM, I interviewed BRISENO along with SA Lamon and GPD Detective Ivan Cornejo.  While on the scene at approximately 5:30 PM, Det. Cornejo had previously read BRISENO his Miranda advisal in Spanish.  This advisal was recorded audio and visually via Det. Cornejo's body worn camera, which I have reviewed.  At approximately 9:53 PM, I reminded BRISENO of his Miranda rights and re-read them to him in Spanish.  BRISENO stated he understood his rights and freely consented to speak with the law enforcement officers without an attorney present.  At this interview, BRISENO told me, in substance and in part, the following:

  a. BRISENO stated he was a citizen and national of Mexico and was in the United States illegally with no immigration documents pending.  At this time, I advised BRISENO of his right to consult with the Mexican consulate.  BRISENO stated he understood his right to speak with representatives from the Mexican consulate and was not willing to do so.

  b. BRISENO admitted to receiving packages and storing them at his residence.  BRISENO initially stated that he

didn't know what was inside the packages.  However, later in the interview, BRISENO stated he observed pills and "glass" when he removed the packages from V-1.  BRISENO admitted that he was going to be paid for receiving and storing these packages.

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

35.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the

seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

        d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

        e.    Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

    36.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

        a.    Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms

illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

       b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

       c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

37.   As used herein, the term "digital device" includes the SUBJECT DEVICES.

38.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That

evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

39.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel

may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

c.    Both digital devices recovered appear to be programmed for use in the Spanish Language, meaning that their review will require investigators that are fluent in the Spanish Language, as well as translators fluent in the Spanish Language, which will significantly increase the amount of time necessary to review the devices.

40.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know all of the passcodes of the devices likely to be found in the search.

c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress BRISENO's thumb- and/or fingers on the devices; and (2) hold the devices in front of BRISENO's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

41.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.    CONCLUSION

42.  For all of the reasons described above, there is probable cause to believe that BRISENO has violated 21 U.S.C.

§ 841(a)(1): Possession with Intent to Distribute Controlled Substances.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __19th__ day of
__June____, 2021.


_____
THE HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE

21